**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ALIGHT SOLUTIONS**, | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 20 C 3043** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **SUSAN THOMSON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

"Defer no time delays have dangerous ends."

Henry VI, Part I (1592) Act III, sc. ii 1.33

**INTRODUCTION**

Late in the afternoon on the day discovery was scheduled to close, plaintiff Alight filed what it called a "Motion to Compel Production of ESI," but which is actually a motion asking the court to order defendant Thomson to turn over all her personal devices – (I) iPad; (ii) Microsoft Surface laptop; (iii) iPhone; and (iv) Mac (Apple) desktop computer – for a third-party forensic inspection and a motion to reopen discovery and extend it indefinitely. For the following reasons, the motion [Dkt. # 85] is denied.

First, it has to be said that Alight's motion is at least somewhat audacious as it completely ignores the fact that discovery was set to close a couple of hours after it was filed on October 12th. Alight seems indifferent to the fact that the relief it asks for, a turnover of multiple personal devices for a lengthy and complicated inspection, *see* The Sedona Principles, Second Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production 34, 47

(2007)("[M]aking forensic image backups of computers is only the first step of an expensive, complex, and difficult process of data analysis . . ."), would necessitate a reopening of discovery for a lengthy and indeterminate time. There are rules about things like that – and Alight improvidently ignores all of them. But that is a foolhardy and improper mode of proceeding. *Tatalovich v. City of Superior*, 904 F.2d 135 (7th Cir. 1990); *Lizza & Sons, Inc. v. Domenico & Pallotta*, 23 F.R.D. 143 (D.Mass. 1959).

## ARGUMENT

## I.

Under Federal Rule of Civil Procedure 16(b)(4), "[a] schedule may be modified *only* for good cause and with the judge's consent." *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 878 (7th Cir. 2021). "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking amendment." *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 553 (7th Cir. 2005); *see also Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 832 (7th Cir. 2016); *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011). The burden of demonstrating good cause and diligence under Rule 16(b)(4) is a more onerous burden than demonstrating "excusable neglect" under Rule 6(b)(1)(B). *Schloss V. City of Chicago*, 2021 WL 4962663, at *3 (N.D. Ill. 2021); *McCann v. Cullinan*, 2015 WL 4254226, at *10 (N.D. Ill. 2015). The inability to meet multiple deadlines – especially when those deadlines are chosen by counsel – is not diligence. *See, e.g., POM of Pennsylvania, LLC v. Pennsylvania Skill Games, LLC*, 2020 WL 6047863, at *3 (W.D. Pa. 2020)(after multiple extensions, another is not warranted); *Ochoa v. City of Oceanside*, 2016 WL 6124463, at *3 (S.D. Cal. 2016)(considering history of extensions in diligence analysis); *Santiago v. New York & New Jersey Port Authority*., 2015 WL 1107344, at *2 (D.N.J. 2015)(multiple extensions).

Because of Alight's insouciance, *compare Boyd v. Reaves*, 2021 WL 4193338, at *1 (S.D. Ind. 2021)(criticizing counsel for failure to acknowledge discovery deadline), its motion did not even bother to address the requirements of Fed.R.Civ.P. 16(b)(4) and the applicable caselaw. All Alight manages to come up with is a half-hearted assertion in a footnote in its reply brief – it cannot get more cavalier or more improperly self-serving than that – that the discovery deadlines do not matter because continued discovery here would not prejudice the parties. [Dkt. #91, at 13 n.10]. But Alight's position could not be more flawed. Conveniently, (and no doubt intentionally) it ignores the basic proposition of law and life that "saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). *Accord Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465, 473 (7th Cir. 2018); *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 770 (7th Cir. 2020)("Notably absent from these allegations, however, is any proposed proof that state actors, not municipal actors, were engaged in this *de facto* discrimination."); *Donald J. Trump for President, Inc. v. Secy of Pennsylvania*, 830 F. Appx 377, 381 (3d Cir. 2020)("But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here."). Even the Solicitor General's unsupported assertions are not enough. *Digital Realty Trust, Inc. v. Somers*, _U.S._, 138 S.Ct. 767, 779 (2018); *Bowers v. Dart*, 1 F.4th 513, 520 (7th Cir. 2021)("With all of this evidence in mind, we share the district court's conclusion that a rational juror could doubt that Bowers was telling the truth by insisting he could not walk."). *Cf. Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)(Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

Moreover, contrary to Alight's view of things, what does not matter here is prejudice or lack thereof. It simply does not enter into the analysis. *Peters v. Wal-Mart Stores E., LP*, 512 F. App'x

622, 628 (7th Cir. 2013); *Atain Specialty Ins. Co. v. Sandwich Fair Ass'n, Inc.*, 2021 WL 929093, at *2 (N.D. Ill. 2021); *Experience Based Learning, Inc. v. Hanover Ins. Co.*, 2019 WL 2576390, at *5 (N.D. Ill. 2019). As such, Alight has not made the required showing or offered a "[]sufficiently robust explanation of why [it] was diligent." *Alioto*, 651 F.3d at 720.

Certainly, the history of this case does not leave one with the impression of "diligence." Quite the contrary. Discovery began back in October of 2020, with the parties completing initial disclosures October 15, 2020. [Dkt. #21]. The court allowed the parties to select April 30, 2021, as their fact discovery deadline. [Dkt. ##21, 25]. The court then generously granted the parties extension after extension. On February 28, 2021, the court extended the April 30, 2021 deadline to July 30, 2021. [Dkt. #44]. On June 10, 2021, the court gave the parties another month to complete their discovery, until August 31, 2021 [Dkt. #70]. On August 25th, the August 31st deadline became September 30th. [Dkt. #79]. And, most recently, when the parties proved unable to meet their discovery deadline for the fourth time, the court allowed them yet another month, until October 12, 2021. For the parties, the deadlines were nothing more than mileposts that they sped by as they careened discovery in this relatively simple case into it second year.

As the 1983 advisory committee note explains, among the aims of Rule 16 are to prevent parties from delaying or procrastinating and to keep the case "moving toward trial." *Alioto*, 651 F.3d at 720. "A good judge sets deadlines, and the judge has a right to assume that deadlines will be honored. The flow of cases through a busy district court is aided, not hindered, by adherence to deadlines." *Spears v. City of Indianapolis*, 74 F.3d 153, 157 (7th Cir. 1996). Deadlines in this case have been routinely ignored, and the history of the case suggests that delay and procrastination have been the rule. As such, it is well within the court's discretion to deny the motion. *Winters v.*

4

*Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007)("We review the district court's decision not to reopen discovery for abuse of discretion."); *Reales v. Consol. Rail Corp.*, 84 F.3d 993, 997 (7th Cir. 1996)("The judge was therefore well within his discretion in concluding that the [plaintiff] had not demonstrated good cause for obtaining a fourth extension of time."). *See also Pyatt v. AECOM Tech. Servs., Inc.*, _F.4th_, 2021 WL 4147091, at *4 (11th Cir. 2021)("[W]e have often held that a district court's decision to hold litigants to the clear terms of its scheduling orders is not an abuse of discretion."); *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1307 (11th Cir. 2011)(". . . though the court had the authority to grant a post hoc extension of the discovery deadline for good cause, it was under no obligation to do so; in fact, we have often held that a district court's decision to hold litigants to the clear terms of its scheduling orders is not an abuse of discretion."). In the end, "[a] scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Younes v. 7-Eleven, Inc.*, 2015 WL 4496621, at *2 (D.N.J. 2015). "Lawyers and litigants who decide to play by rules of their own invention will find that the game cannot be won." *United States v. Golden Elevator, Inc.*, 27 F.3d 301, 302 (7th Cir.1994). Accordingly, Alight's motion is properly denied under Fed.R.Civ.P. 16(b)(4).

## II.

Even if what Alight was asking for was not something so involved and open-ended that granting it would reopen discovery for an unspecified length of time, its motion would still be an eleventh-hour motion to compel. "When parties wait until the last minute . . . they are playing with fire." *Spears*, 74 F.3d at 157. Last minute motions to compel are rarely proper and are rarely well-received. *See, e.g.,Packman v. Chicago Trib. Co.*, 267 F.3d 628, 647 (7th Cir. 2001)(district court did not abuse its discretion in denying plaintiff's eleventh-hour motion to compel discovery);

*Summy-Long v. Pennsylvania State Univ.*, 715 F. App'x 179, 184 (3d Cir. 2017)(district court properly denied motion to compel filed on the last day of discovery as untimely). While courts are always appreciative of parties taking some time to work out their differences before asking for judicial intervention, such efforts have to be undertaken in good faith; there has to be some give and take. Here, Alight started out by demanding forensic imaging of all of Thomson's personal devices way back on November 16, 2020. [Dkt. #86, at 2]. Thomson, predictably, objected and the parties have been going back and forth ever since. The result? Alight is demanding a turnover of all Thomson's personal devices for forensic imaging and investigation. Alight is right where it started a year ago. The result, at least, does not suggest that there was any negotiating in good faith during that year. *See, e.g., Chicago Regal Council of Carpenters Pension Fund v. Celtic Floor Covering, Inc.*, 316 F.Supp.3d 1044, 1046 (N.D. Ill. 2018)("An ultimatum on one side, met with steadfast defiance on the other, is not a good faith discussion."); *Gunn v. Stevens Security & Training Servs., Inc.*, 2018 WL 1737518, at *3 (N.D. Ill. 2018)("A party that steadfastly maintains a position without support is not engaging in a good faith discussion."); *Infowhyse GmbH v. Fleetwood Grp.*, 2016 WL 4063168, at *1 (N.D. Ill. 2016)("... adamantly clinging to the positions with which they began" amounts to a failure "to comply, in good faith, with the requirements of Local Rule 37.2."). Alight's motion to compel could have been filed a month ago, or six months ago, with little or no difference in where the parties stood. Filing a motion to compel a mere hour or two before the close of discovery is unacceptable.

**III.**

So the motion, as already indicated, is denied. But, even taking a closer look at it, the motion has little to recommend it. To begin with, it is premised on a misrepresentation of the pleadings,

even though all counsel in the case have an obligation of candor to the court. Contrary to Alight's mischaracterization of Thomson's answer, Thomson did not admit "that she emailed to herself and printed confidential business documents in violation of her contractual obligations and Alight's policies." [Dkt. #86, at 2]. She admitted that she emailed a couple of files to herself, but denied that they were highly confidential or proprietary. [Dkt. #57, Pars. 27-30]. Exaggeration or mischaracterizations are not ideal methods to convince a court to order a turnover of personal devices in a civil business dispute. *See* Richard Posner, *What Judges Think of the Quality of Legal Representation*, 63 Stanford L.Rev. 317 (2011).

If one chooses to set that aside – and the court does not – unraveling the convoluted history of the parties' attorneys arguing over this discovery would require a trial in itself, or perhaps a *lengthy* mediation. Alight has attached 250 pages of, in the main, angry emails back and forth between counsel scattered across 38 exhibits. As already noted, this battle goes back a year, to November of 2020, when Alight first demanded forensic images of Thomson's personal devices. Asking a court to sift through a years' worth of attorney arguments in the final hours of discovery is, to put it mildly, a bit much. But here we are.

Thomson objected to Alight's demand, of course, and the fighting began. Not much came of them until February 17, 2021, when Thomson produced over 1500 documents. Alight claims these documents included "sensitive financial and commercial documents and compensation information related to other Alight employees." [Dkt. #86, at 3]. But, despite hefting 250 pages of email arguments on the court, Alight fails to provide any examples of these "sensitive financial and commercial documents" or even describe them. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991).

7

Thomson says the information pertained to *her* employment – information regarding benefits, HR policies, equity agreements and tax documents – and documents that she had emailed herself over the years from time to time to print out on her home printer for review. [Dkt. #89, at 4]. She doesn't provide any examples either, but it's certainly not uncommon to review these types of materials, which are too often unnecessarily complex, at a leisurely pace at home away from the distractions of the office.[1] Even working remotely, it is often easier to review such things once the needful taskmaster of the office-issued computer, with its alerts and windows popping up unceasingly. So, that ought not to have shocked Alight; its whole business depends on the fact that employee benefit plans are complicated to figure out. But, the upshot is, whether any of this material qualifies as confidential or proprietary or trade secrets is a matter for summary judgment or trial. It is not, as Alight feels, beyond dispute.

In any event, at that point, Alight renewed its demand for forensic imaging of Thomson's personal devices. From November to February, there had been, in essence, no progress. Thomson responded with a "I-know-you-are-but-what-am-I" demand for forensic imaging of her former Alight devices, which Alight refused. The attorneys continued to butt heads until April 2021, when Thomson agreed to allow forensic inspection of Thomson's laptop if Alight would pay for a third party, Xact, to image that device. [Dkt. #86-9]. There was no agreement on the other devices. [Dkt. #86-10]. But there had to be a reasonable protocol, of course. Alight then sent Thomson a protocol that Alight wanted used in the imaging and collection process. But Alight's protocol had little if

---

[1] Thomson describes some of the materials such as: test emails through which Thomson tested her "out-of-office" email notification (Thomson 0655, 1446); an email forwarding to her personal email a gift card originally sent to her work email (Thomson 0656-59); and emails from Thomson to her husband about her separation from Alight (Thomson 0883-85).

anything to do with the parties' seeming agreement as to the laptop. It covered not just the agreed upon laptop, but all personal and family devices and indicated that Thomson would bear the full cost of the froensic imaging and investigation. [Dkt. #86-12, §. I]. Alight responded to Thomson's rather uncontroversial objections by saying it would be filing a motion to compel turnover and forensic inspection. [Dkt. #86-11, Page 8/9].

Of course, Alight filed no such motion. As night follows day, the attorneys argued over the protocol for another couple of months. Alight claims its protocol proposal "ensured that Thomson's personal information would not be disclosed." [Dkt. #86, at 5]. But that's not true; the protocol provided only that attorney-client privileged information could be redacted, and made no mention of personal information. [Dkt. #86-12, Pars. III.C; IV.C ("Thomson's counsel shall review the files to determine whether the files/ contain information subject to the attorney-client privilege or attorney work product doctrine. Thomson may redact information that is subject to these privileges, provided that such items are listed on a Privilege Log provided to Alight's counsel.")].

At the beginning of June 2021, Alight finally and very reluctantly agreed to bear the costs of forensic imaging and proposed that in a good faith effort to efficiently advance the process." [Dkt. #86-14]. Thomson wanted her personal information protected from dissemination pre-search by selection of search terms that would reduce the risk of accessing it. [Dkt. #86-17]. Alight tells the court that it explained that Thomson's personal information would be protected by (I) allowing her unfettered access to all information prior to disclosure to Alight; (ii) restricting the date range to January 1, 2017 to present; (iii) treatment of all information as AEO; and (iv) Xact retaining all imaged devices. [Dkt. #86, at 5-6]. But, in reality, the email Alight sent to

9

Thomson addressed privacy protection by no more than the temporal insertion:

> The measures set forth in the agreement as originally drafted, coupled with the insertion of the above stated temporal limitation, afford more than adequate privacy protection and do not impose an unduly burdensome review upon Thomson. Notably, you will have access to the information before we do, and screening for privileged documents can be efficiently accomplished by searching for the names of any attorneys who have provided Ms. Thomson with counsel during the Relevant Period.

[Dkt. #86-14]. Contrary to Alight's representations to the court, there was no provision allowing Thomson "unfettered access" to cull her private and personal information from production. So, Alight's motion says one thing, and the documents it attaches to purportedly support its version of the parties' dispute say another. Obviously, that's no way to convince a court to grant the extraordinary request of a turnover of an individual's personal devices for inspection.

As the fighting continued, Alight finally allowed that if the personal information– such as financial information, medical information, and information relating to Thomson's family– was not relevant to the case, it could, of course, be withheld. [Dkt. #86, at 7]. But, of course, it would not be withheld from Alight's third-party forensic specialist. That's not a small thing and one reason why courts are often very reluctant to order an individual to turn over their personal devices to a third party for examination. It has to be regarded as tantamount to allowing a stranger to ransack a litigant's home or, as the Supreme Court has explained, far more intrusive:

> a cell phone collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record. Second, a cell phone's capacity allows even just one type of information to convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions;
>
>       *     *     *
>
> An Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or

concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD. Data on a cell phone can also reveal where a person has been. Historic location information is a standard feature on many smart phones and can reconstruct someone's specific movements down to the minute, not only around town but also within a particular building. *See United States v. Jones*, 565 U.S. ——, ——, 132 S.Ct. 945, 955, 181 L.Ed.2d 911 (2012) (Sotomayor, J., concurring) ("GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.").

         *   *   *

a cell phone search would typically expose to the government far more than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is.

*Riley v. California*, 573 U.S. 373, 394, 395–97 (2014).

And so, July 2021 brought additional fighting. After all that time, Thomson's local counsel took over the dispute, which, of course, was not ideal – to say the least – given all that had gone on before. And, not surprisingly, Thomson's counsel decided that the ransacking of Thomson's devices would be undertaken in-house. Then, it was time for the parties to go back and forth on search terms. Alight's proposed search terms "consisted of (I) names of Alight clients/prospects; (ii) Alight employees' names from Thomson's Outlook calendar meetings; and (iii) terms relating to Alight business lines." [Dkt. #86, at 8]. Incredibly, these amounted to nearly *3000 search terms*. [Dkt. #86-24]. Obviously, that was unacceptable to Thomson.

Thomson eventually came back with her own proposal on August 9, 2021. The search would be limited to the timeframe October 1, 2019 to present, and the search terms would be: all 31 terms Alight listed on an excel spreadsheet labeled File names; all 32 terms Alight listed on an excel spreadsheet labeled Tools; 10 names, chosen by Alight, out of 234 names of Alight people originally listed; 10 entity names, chosen by Alight, out of 2,964 entities Alight originally listed. The

production would exclude SPAM emails and emails sent to/from Thomson's current counsel at Roetzel & Andress and Nelson Mullins. Thomson would provide Alight with a "hit report" detailing the "hits" each search term uncovered and would produce a privilege log of excluded communications with, or work product of, Thomson's current counsel. [Dkt. #86-26; #89, at 5]. Thomson's counsel said they expected to produce the documents by close of business August 13th. [Dkt. #86-26].

It should come as a surprise to no one familiar with American litigation that things did not go as Thomson's counsel promised. August 13th became August 16th; August 16th became August 23rd; and finally, Thomson began a rolling production on August 30th. Through the month of September, Thomson had produced an additional over 6000 pages and the "hit list" to Alight. [Dkt. #86-33; #89, at 6]. But there were technical difficulties accessing materials from Thomson's ten-year-old desktop computer and efforts stalled. Mid-month, Thomson managed to copy her entire user folder from her desktop to an external drive, and shipped it – 1.5 terabytes – from her home in Connecticut to her attorneys in Akron, Ohio. There, the litigation team ran the Alight search terms over the files taken from the Thomson family desktop computer. [Dkt. #89, at 7-8]. After removing files that had already been reviewed on the other devices and accounts, nearly 4000 files were left to be searched. Of those, the search terms "hit" on 886 documents. Thomson reviewed those documents and produced 286 documents to Alight. [Dkt. #90]. That's where things stood as of October 20, 2021.

The question from Alight's motion remains: was all that sufficient, or is much more necessary. The answer, as the parties were unable to resolve their differences on their own in the course of a year, is committed to the broad discretion of the court. *Kuttner v. Zaruba*, 819 F.3d 970,

974 (7th Cir. 2016); *James v. Hyatt Regency Chicago*, 707 F.3d 775, 784 (7th Cir. 2013). Discretion denotes the absence of hard and fast rules. *Langnes v. Green*, 282 U.S. 531, 541 (1931). Being a range, not a point, discretion allows two decision-makers – on virtually identical facts – to arrive at opposite conclusions, both of which constitute appropriate exercises of discretion. *See McCleskey v. Kemp*, 753 F.2d 877, 891 (11th Cir. 1985), *aff'd, McCleskey v. Kemp*, 481 U.S. 279, 289-290 (1987). *Accord Mejia v. Cook County, Ill.*, 650 F.3d 631, 635 (7th Cir. 2011). *Compare United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995) with *United States v. Williams*, 81 F.3d 1434 (7th Cir. 1996). Has there been enough discovery? One judge will say yes, while another might say no. As a result, a party that obdurately maintains its position without budging could insist that it was "right," but find itself on the losing side when it brings the matter comes before the court, and the court's broad discretion in overseeing discovery leads it to accept the other side's "right" position. In this instance, I find that Thomson has now done enough and the circumstances don't warrant a turnover of all her devices.

"A forensic ESI exam constitutes an extraordinary remedy that is required '[o]nly if the moving party can actually prove that the responding party has concealed information or lacks the expertise necessary to search and retrieve all relevant data.' " *Belcastro v. United Airlines, Inc.*, 2019 WL 7049914, at *2 (N.D. Ill. 2019). "Mere suspicion or speculation that an opposing party may be withholding discoverable information is insufficient to support an intrusive examination of the opposing party's electronic devices or information system." *Belcastro*, 2019 WL 7049914, at *2. *See Motorola Sols., Inc. v. Hytera Commc'ns Corp*, 365 F. Supp. 3d 916, 925 (N.D. Ill. 2019). The Advisory Committee Notes to Rule 34 recognize that courts must use caution in evaluating requests to inspect an opposing party's electronic devices or systems for ESI, in order to avoid unduly

13

impinging on a party's privacy interests:

> Inspection or testing of certain types of electronically stored information or of a responding party's electronic information system may raise issues of confidentiality or privacy. The addition of testing and sampling to Rule 34(a) with regard to documents and electronically stored information is not meant to create a routine right of direct access to a party's electronic information system, although such access might be justified in some circumstances. Courts should guard against undue intrusiveness resulting from inspecting or testing such systems.

*3 Fed. R. Civ. P. 34, Advisory Committee Notes—2006 Amendment (emphasis added).

Likewise, the Sedona Principles urge general caution in this area:

> Civil litigation should not be approached as if information systems were crime scenes that justify forensic investigation at every opportunity to identify and preserve every detail.... [M]aking forensic image backups of computers is only the first step of an expensive, complex, and difficult process of data analysis that can divert litigation into side issues and satellite disputes involving the interpretation of potentially ambiguous forensic evidence.

Id. at 925 (quoting The Sedona Principles, Second Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production 34, 47 (2007)).

Thus far, it has to be said that there has been a "crime scene" approach from Alight. Discovery has to not only be relevant, but "proportional" to the needs of the case, "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). This is a run-of-the-mill breach of a non-compete clause case. The trade secrets at stake are, essentially, corporate strategies, business plans, and customer lists. They may be protectible trade secrets and they may not, but they don't distinguish this case from hundreds of similar cases and put it in the category meriting the extraordinary measures Alight wants the court

14

to order. And hardly any of those similar cases involve turnovers of personal devices – at least, Alight has not alerted us to any. And, as for taking those alleged trade secrets to a competitor, Alight has claimed it is not even able to articulate specific examples of how and where Embold – Thomson's landing place – competes with it in the healthcare navigation business. [Dkt. #83].

Additionally, the technical difficulties Thomson had accessing files on her old family desktop – which have been overcome – are not so alarming. They are not, at least, tantamount to spoliation as Alight claims. *See, e.g, Belcastro v. United Airlines, Inc*., 2019 WL 7049914, at *2 (N.D. Ill. 2019) (court may compel a forensic examination of a party's personal devices where the moving party demonstrates that the responding party has concealed information or lacks the expertise necessary to search and retrieve all relevant data); *Bierk v. Tango Mobile, LLC*, 2021 WL 1088272, at *3 (N.D. Ill. 2021)(compelling turnover and third party inspection where party claimed to be unable to open and access files on old device). In short, this isn't the Pentagon Papers and Ms. Thomson isn't Daniel Ellsberg.

There has been a lot of ESI discovery produced, and there has been more than a good deal of trouble over it. Sending everyone back to the drawing board and ordering Thomson to turnover personal and family devices to a third party for another investigation and dragging things out well past the already-expired October 12th deadline is simply too much. Moreover, it strikes one that a second investigation would likely be "unreasonably cumulative or duplicative" Fed.R.Civ.P. 26(b)(1), especially given Alight's stance that it already has ample evidence of Thomson violating company policy and misappropriating what Alight characterizes as "sensitive business files" and "myriad confidential company documents" confidential company documents" [Dkt. #91, at 2-3, 4-5]. *See Motorola Sols., Inc. v. Hytera Commc'ns Corp*., 365 F. Supp. 3d 916, 926 (N.D. Ill. 2019)(no

need for forensic examination of corporate defendant's computers where corporate plaintiff claimed in alrady had evidence that its source code was misappropriated).

Moreover, it is perhaps telling that Alight has not cited any cases in which the court was convinced to order a turnover for forensic inspection. In *H Guys, LLC v. Halal Guys Franchise, Inc*., 2020 WL 3578026, at *5 (N.D. Ill. 2020), the plaintiff sought, and I ordered, essentially what Thomson has already done here: a search conducted with counsel's guidance and oversight. Actually, Thomson and counsel have gone beyond what was ordered in *H Guys*. In *Cty. of Cook v. Bank of Am. Corp*., 2019 WL 6309925, at *7 (N.D. Ill. 2019), the court simply ordered an ordinary document search and production. And, in *Mann v. City of Chicago*, 2017 WL 3970592, at *1 (N.D. Ill. 2017), the court ordered that some additional custodians be included in an ordinary email search. None of these cases resulted in a turnover of personal and family devices.

Alight is seeking an extraordinary remedy at the conclusion of the discovery deadline – a deadline that has been extended multiple times. Alight has failed to come to grips with Fed.R.Civ.P. 16(b)(4) and the caselaw about reopening discovery and last-minute motions to compel. The extraordinary form of discovery Alight seeks is simply not "proportional" to the needs of the case, "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see also Pable v. Chicago Transit Authority*, 2021 WL 4789023, at *2 (N.D. Ill. 2021) (court must consider "whether such an examination is proportional to the needs of the case given the cell phone owner's compelling privacy interest in the contents of his or her cell phone"). Accordingly, Alight's motion for an order that Thomson turn

16

over her personal and family devices for inspection is denied.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 11/3/21

17